The next case to us is 24-146A, Largan Precision v. Motorola. Mr. Russell, whenever you're ready. Good morning. May it please the Court, Kevin Russell on behalf of Appellant Largan Precision Co., Ltd. The central question in this case is whether a person of ordinary skill in the art Could you speak up just a little bit more, please? I apologize. The central question in this case is whether a person of ordinary skill in the art Would have a reasonable expectation of success in dealing with the image quality problems That would result from combining the lens assembly system described in the KR-872 patent With a lower F number. And in particular, the question is whether something in the art provided more than a general approach To a promising field of expectation, where the prior art only gave general guidance As to how to achieve that result. So this is a pure substantial evidence case. And isn't the evidence relied on by the Board, including the known benefits of having a low F number That persons skilled in the art commonly reduce F numbers Wasn't there substantial evidence that this would As to why one would have been motivated to make this combination? So first of all, we don't raise simply a substantial evidence. We don't raise simply a substantial evidence objection. We say that the Court applied the wrong standard. But to answer your question, the Court did, or the Board, did say that one of the reasons In fact, its principal reason for finding obviousness Was that low F numbers were desirable and had been achieved in other systems Multi-lens systems for portable devices. We think that that And they didn't make that up. I mean, there was an expert. There was expert testimony. But the error in that analysis. First, this Court has repeatedly held that just because something is desirable Doesn't mean it's obvious how to achieve it. And second, the Court, the Board, pointed to nothing in those other multi-lens systems That would have, that were so similar to KR-872 That they would have taught POSA what to do to achieve the same result in KR-872. And in fact, when Dr. Milster testified about what he did to recreate the invention He never cited to those other systems. And so we think that part of the rationale is, you could call it insufficient As a matter of law. Maybe it's insubstantial evidence. But I think it is contrary to this Court's teachings about, you know, what is sufficient To show a reasonable expectation of success. Now, the Board did also point to this fact. Do you want to give us a case or two where you say that the Board applied an erroneous Standard? Well, I think the Court has frequently said that just because something is desirable Doesn't mean that it's obvious. And is that what the Board said here? That is one of the things that the Board said. The Board also said, as we were discussing, that there are other systems that achieve That result. And then we point out, just as a matter of analogy, the fact that there are other Small cars that are able to go 200 miles an hour doesn't mean it's obvious to show How to make a VW Bug go 200 miles an hour. Well, Counselor, can you point us to where specifically in the Board's decision You're taking issue with what the Board said or the alleged error that you are identifying? Kind of a follow-up to Judge Prost's question. Right. So this part of the rationale that we're discussing here, that it's desirable And that there are other multi-line systems that have achieved it, that's at page 31 Of their opinion. I'm sorry. That's at page 31 of their opinion. The second rationale that they give is the fact that ARC taught this iterative process, This idea that to achieve this result, you... Which your own expert validated. Well... Our expert validated? Yeah. Well, certainly our expert says that this is a general process you can use to solve this kind of problem. One woman I know in the ARC, including me, knows to do this. Knows to do this. You just go to a computer-generated software program and people know how to run it. And we ran it. Took, what, 20 hours? And, boom, it did it. So I think, again, this court's cases draw this important distinction Between success being achieved because something we are provides some actual teaching on how to do it. In cases in which... As everybody knows, you get a lower f-stop, faster, better light, quicker action. Clearly desirable to do this. And there is a well-known program, computer program. Sure, you have to go for steps. You start slow. You go incrementally. Program tells you how to do it. No, that's the key mistake, I think, in that line of argument, Is the computer does not tell you how to do it. Dr. Milster acknowledged that there has to be something in there. We haven't shown that it didn't. Well, Dr., nobody claims that... Well, part of the problem here is that both of the board and him, Nobody tells us much exactly how ZMAX is really working. We have the testimony from their expert that says we ran it. Here's what I did. Didn't create any particular obstacles for me. So if you look at paragraphs 24 and 25 of Dr. Milster's reply declaration, Which was where he explains in the greatest detail what he did with the ZMAX software. He explains that the way it all works is you, at each step, Have to identify which of the dozens of variables you're going to hold constant Or make into variables that computer can look at. And he said, I did it. I did it. Well, but the question, then, is what did he do it, Just because there was something general, I mean, some general guidance that he had. Well, he did it because he was skill in the art, and he has a tool here. You can use this and go to step one and look and see, oh, my God, it isn't working. And then you use your general knowledge in the field to figure out which lens is the problem And what you have to do to adjust it a little bit, and you adjust it. And then you run it and say, okay, now it got that f-stop. You dial, go down a little lower and try the next one. That's the way I understood it worked. I think that is a general description of it, except that. And you are correct to describe. And so that's what one of the ordinators still in the art is motoring along. And, boy, he gets to the first time he works. He said, this is working. I'll keep going. I have motivation to go to the next step, to go to the next step. And he does. So what you are describing, Your Honor. You know, an F-1-6, I mean, just as a record, I mean, why could I have an F-1 go to an F-1-0 in 1970? But you didn't get F-1 or anything like it in a mobile phone until very recently, which shows, I suggest, that it isn't completely obvious how to do it. Let me use the example of an actual case. In Inmate Grunenfall, this Court confronted a similar situation where the question was, was it obvious how to find a polymorph of a particular compound? And the Court said, look, there wasn't any detailed methodology how to do it. Instead, what the challenger pointed to was an iterative process like this and a flow chart that looks very much like the one in this case. And this Court said that it's not enough if that process simply provides general guidance for a course of general experimentation. So there is a distinction you have to draw between whether this iterative process, whether the decisions that POSA is making at those stages where they're deciding what variables to leave constant, which values to assign to other ones, is that then just experimenting, which Inmate Grunenfall says is not sufficient, or is it something that they're being taught in the art specifically, in that we know that the board did not ask that question. That's the key question, and it didn't answer it, because when we objected that Dr. Milster didn't record the data from each of his iterative steps, the board said it didn't matter. And that's – and this is at page 46 of their opinion. And they said it didn't matter because we view Dr. Milster's ZMAX modeling as being directed to showing that the iterative optimization process would have resulted in actual success. So the only thing they took away from his ZMAX modeling was that it was successful, and they assumed that because he was successful, it must be something that a POSA would have been successful at doing as well. And that doesn't follow, and it doesn't draw the – So you're not disputing the board's definition of a person of ordinary skill in the field?  Okay. And also, you don't dispute that lowering the F number was known art for multiline systems, right? That it had been achieved in some other systems, although there wasn't any proof that those systems were so similar that they provided any actual teaching about how to do it to this system. And so there's at best very indirect evidence that it might be possible. It's certainly not the case that every multiline system is this fast, and so it raises the question – But you are acknowledging, just so that we can level set here, that at least in some multiline systems, lowering F number was known in the art, correct? That it had been accomplished in the art. How to do it and whether that teaching was applicable to KR 872 is the real question here, right? And the question is, is there something in the art that taught somebody how to achieve what they had done in these other systems with this system? And simply the fact that they have achieved it in some other system doesn't mean that they could do it for KR 872. And again, as I mentioned, Dr. Milster, when he achieved the same result, he never pointed to those other examples and said, I learned anything from these other systems or did what those people did. The standard is a reasonable expectation of success, not certainty that there's going to be success. To be sure. If there's a motivation to combine, which I think there was here in terms of the benefits that derive from a lower F number, that's what KSR says we do. And particularly given the findings based on expert testimony that the board chose to credit and a substantial evidence review, I don't know how we avoid the result. Again, and I'm sorry if I'm repeating myself, I think the legal error was the failure to distinguish between whether what Dr. Milster accomplished was the result of general experimentation, which Gunenthal, Inouye Cuban, O'Farrell all say is insufficient, or instead was either something directed, more directed by the arts, something somebody would know how to do at each step, which Dr. Milster said, but he said it in a completely conclusory fashion, or was far within the KSR obvious to try. And the board, to its credit, recognized that the existence of the iterative process, at best, showed only that it was obvious to try, but it then misapplied KSR's test by asking, by saying that there are a finite number of solutions, because there was only one solution to try, which was to lower the F number. It's explained, though, that that's not right, because everybody agrees that if you just lower the F number, you end up with a lens system that doesn't work. And nobody would be motivated to create a lens system that doesn't work. Well, it depends on how you lower it. If you lower it all the way to F1, yes. Well, no, it's, so Dr. Milster When you say an existing lens has got a F12, and you go to F11.9, and it works, and F11.7, and it works, you dial down to see how low you get. That's what ZMAX does. Two things about that. One is, Dr. Milster admitted that you couldn't just put a lower F number in there, because there's a limit.  And that's a no-brainer, right? So the question is, what additional steps do you have to take? And he did not testify that you can just do it in increments, and the computer will figure the rest out. You take the lens you're trying to modify with ZMAX, and you plug in all the characteristics of the lens. Nobody disagrees with that, right? And then you make some type of a prediction about what the F-stop is on that particular lens, with those six components put together. Nobody disagrees that that's possible. Low-skill New York can do that. So let's just assume that the Korean reference had a whatever it was. I mean, nobody disagrees. That's what it was to start with. The iterative process says don't go to F1, because that won't work. Everybody knows that. So assume that the Korean pattern was F7. You go to 6.9. See what happens. Right? And when you see what happens, you will find that it still doesn't work. And you've got to make some modifications. Of course. And then the lens designer has to make some choices. And the question is whether those choices are taught in the art, or instead is just general experimentation. That's the key question. And it's the question that the Board did not ask. Because the only thing that the Board... Why would you ask them to ask that? We complained... I mean... I mean, we complained... Is that in your brief? I mean, it sounds like a new argument to me. In our brief to you? I mean, this is our principal argument in the brief to this Court. We made the argument to the Board that it could not consider whether or not this was obvious without knowing the data from the interim steps. And this is what I was discussing before. And they said, we don't have to have that data, because the only thing we're looking at is the last step and the fact that it was successful. Right? And so our legal error that we're trying to establish here is that the Board was required under Grunenthal and Inouye-Cuban to distinguish between whether success would be achieved simply through experimentation. Because we have... We know that experimentation can lead to success. We can even expect that it will. We can expect that, you know, vaccine scientists will find a cure... I'm wondering in your questions presented whether you argue there's a legal error. With motivation and blind reason, lack of attention, success. Maybe I... I don't see any legal error argument being presented to us. I respectfully disagree. If I could follow my colleague from the last argument's example and provide you the site at rebuttal... I'm just looking at the... You want to take up your question? I'm looking at the front page here, a little brief. Misapplied, obvious to try. I understand that argument. I don't understand the legal error argument. Well, you said, with the error in concluding that a person with reasonable skill and merit would have the motivation and reasonable expectation of success to combine these things simply because doing so was desirable and the LEND system did not share gifts. KR-872's design have lower F numbers. Well, you see this point. So that is an objection to their principal argument, that this idea that it was desirable... There's a way in the English language you say the fundamental problem here is that they committed a real legal error. So that's... That would have caught my attention. So that's point two on the next page. This is our objection to the... That there are other systems and it's desirable. And we say that's not good enough. You can call that substantial evidence. You can call that a legal error. They also say iterative process, and that's our objection number two on the next page, where we say that this misapplied the obvious to try number two and three. We both say that that's not substantial evidence and that most of what I was wanting to say about this was that it was obvious to try. I see that I've run nearly out of time. Yes. Let's hear from the other side.  Good morning. And may I please report the... Sounds like the only dispositive issue is whether substantial evidence supports the Board's finding that there was a reasonable expectation of success here. We submit it does. The Board relied on layers of evidence. I think we have already discussed the numerous prior art designs that were discussed by Dr. Milster, Motorola's expert, in concluding and opining that it was known that designs of this type could reach F numbers as low as 1.5. In addition to that, Dr. Largan's only argument at the Board, distinguishing those prior art designs was, well, some of them have five elements, not six. And the Board addressed that in Appendix 31 to 32, saying, well, some of these designs have six elements, just like the Korean reference, just like KR-872. There were no other differences pointed out at the Board. The Board noted these are all for electronic devices. These are six-element designs. So in addition to those prior art designs, Dr. Milster also cited evidence, including a textbook from 2008, and this is at Appendix 6817 to 6820, paragraphs 18 and 19. He discussed and explained why KR-872 was inherently capable of reaching a low F number within the claimed range. He also cited at Appendix 6823 to 64, this is in paragraph 23 of his declaration, that Largan's expert, Dr. Bentley, identified a similar starting point for KR-872 as, quote, at least a good place to start. So it seems that all were in agreement. And I don't see this disputed in their briefing. This design was inherently capable, and skilled artisans would recognize it as inherently capable of reaching these lower F numbers. That alone right there is enough for the reasonable expectation of success. No, there's not absolute certainty. I would submit there's actually certainty here. But, you know, even absent that certainty, there's certainly an expectation of success. Well, you mentioned a few times this morning a case called Grunenthal. And he did cite it in blue a number of times. And I didn't see in red when he responded to that. So do you want to respond to that now? Yeah. And we, in terms of Grunenthal, my understanding of Grunenthal is it did not, it was highly distinct from the facts here. One, it was an unpredictable art. We submit that the Board here found this was a predictable art, this was a predictable process. In addition here, unlike Grunenthal, there's a specific defined path for reaching low F numbers. So you have the specific software. You have the ZBAC software. That's discussed at Appendix 40, citing to Appendix 427, Paragraph 34. You have a specific command within that ZBAC software. This is at Appendix 3523, where it says, quote, most design programs have the capability to easily adjust or scale the aperture. And then, in addition to that, here we have a specific lens design form in the Korean reference, right? This provides the form. And Dr. Bentley, their expert's own book says, when you're doing this optimization, you want to maintain the basic design form. KR 872 provides this. The Board discussed this at Appendix 33 to 34. Dr. Molster explained that this was a suitable starting point for F numbers as low as 1.2. So in addition to that specific form, we have a specific process for lowering the F number. This was not general experimentation. Smith, at Appendix 3523, says you lower it 10 to 50 percent at a time, optimizing between each step. And he goes on to say on that same page, this works well, assuming you have a design that can accommodate the lower F number. Well, it's undisputed that this design could accommodate the lower F number. And then we go on to Bentley's own book, Appendix 6580, where she says this is one of the most common scenarios. So for lens designers, this was pedestrian. This was not some general experimentation in a brave new field. This was something lens designers regularly did. And at the bottom of that page, Appendix 6580, she says the solution, and she lays out what the solution is. In addition to that, we also have testimony and evidence that seems to be undisputed about the level of skill in the art.  Posidas had specific experience using this process. So the Board discusses this, for example, at Appendix 40, citing Appendix 427, paragraph 34 of Milster, that skilled artisans would have regularly used this type of software, quote, to create new lens designs, often using preexisting lens designs as a starting point and then performing routine optimizations to reach a desired design. So unlike Cludental, unlike the other cases cited by my patent owner, here we've got very specific guidance on how to do this. There's more than a reasonable expectation of success. And that's not even getting to Dr. Milster's actual modeling, which showed actual success. And I think what's telling here is the different approaches taken by the experts. On the one hand, we have Dr. Bentley, Largan's expert, who authored a book describing, quote, the solution to this very problem, which she characterized as a common scenario. She agreed that KR 872 provided a good starting point, that's at Appendix 6815, but did not even follow her own solution in purportedly attempting to lower its F number rate. She gave up after it didn't work. In contrast to that, we have Dr. Milster, who twice, you know, ran this optimization process on the KR 872 design, addressing supposed issues or errors that Largan had identified in its patent owner response, and followed Dr. Bentley and the solution laid out in her book, which had been described as early as 2005 and in the Smith lens freeze before that. The board analyzed and credited Milster's testimony, and it largely found that Dr. Bentley's testimony was not credible here. So unless there are further questions. Do you have a question before you? Yeah. I don't know if you're trying to sit down or if you're just moving on to another issue, but you can go to the same issue if you were going to move on to it. I want you to respond to the purported errors that Opposing Counsel says in the board's analysis on the obvious to try. Yes. So first of all, we submit that the board got obvious to try right here. I think if we look at the board's analysis, and this is page appendix 36, and it's 46 to 37, spanning those pages. So on page 36, it begins to talk to us. Did you argue this or did this board bring this up on its own? Oh, the obvious to try. Yeah, we did not argue obvious to try. I didn't think so.  And so we would submit that. The board also raised it as an alternative. It's clear that they found this was obvious. Yeah. And I think that, yeah, maybe that's a better place to start is this obvious to try. The Court need not even reach these obvious to try issues. The board clearly found a reasonable expectation of success. That is more than supported by substantial evidence, and the Court should affirm on that basis alone. So in our opinion, we don't need to address obvious to try to rule in your favor, is what you're saying. You need not address obvious to try. But if you do, we submit that, based on what we say in the papers, that it was obvious to try, in part for the reasons I just articulated. Namely, this was not general experimentation. This is something someone knew, hey, as Dr. Bentley said, it's the solution to lowering the F number. If there are no further questions, I will cede my time. Thank you. I just want to make three quick points. First, I don't think there's any genuine dispute that the application, the board's application of KSR was wrong. They don't explain why the board identified the right solution when it said there was only one solution to try. But even if you – But your – that point, you're making kind of a legal error, deals with the obvious to try, not to the rest of them. So all you're left with then is either the point – Am I right about that? That's right. It only deals with that problem. So then you're going to have to affirm on either the ground that it was desirable, which this Court has repeatedly said is not sufficient, and simply the fact that some other lens systems with no proof that they have any teachings in them are sufficiently similar to this one to provide concrete guidance on how to achieve the same result. And this is – Counsel, what about the distinction that opposing counsel is drawing here, where you're relying on some cases that deal with unpredictable arts versus cases that deal with predictable arts? I don't think the board here made a finding about whether this is a predictable art or not. But we know that it's not predictable. The whole premise of the iterative process is the only way to find out whether any solution will work, which try it out, see if it works, and if it doesn't, try something else. And so that's always going to be possible in a case like this, to hire an expert who says, you know, I reproduced the same invention through an iterative process. And that's going to be the end of lens design patents, unless the board is forced to go a step further and say, look at what you actually did and decide whether that falls in the line of general experimentation that the court said was insufficient and gruenthal in other cases, in right Cuban, or whether it was satisfies KSR, which would have taken off the table, or whether it provides what he says was very – my friend said was very specific guidance. And I urge you to look at the things that he pointed to. Dr. Muster's very specific guidance was simply just this iterative process. Try something. If it doesn't work, try something else. It is not the case that the computer can solve these problems for you. Dr. Muster acknowledged that it requires the judgment of a lens designer, which he had a bunch of. And we can't just simply assume that because he was able to accomplish this result, opposed would as well. Thank you.  The case is submitted. Thank you.